IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
April 19, 2006 Session

## DEBRA OWENS v. SHELBY COUNTY GOVERNMENT

**An Appeal from the Circuit Court for Shelby County**
**No. CT-005101-02     James F. Russell, Judge**

---

**No. W2005-02083-COA-R3-CV - Filed September 11, 2006**

---

This is a lawsuit for on-the-job injury benefits.  The plaintiff was employed as a jailer for the defendant county government.  She injured her back in a slip-and-fall accident which occurred during the scope of her employment.  The county paid her on-the-job injury benefits while she was being treated for her injuries.  After about two months, her treating physician released her from his care, stated that she had no permanent anatomical disability, and determined that she was capable of unrestricted work.  The county stopped paying her on-the-job injury benefits and she returned to full-duty work. Later, complaining of continued back pain, the plaintiff saw another physician.  This physician opined that the plaintiff had a 6% permanent disability to her body as a whole as a direct result of the slip-and-fall accident.  The plaintiff filed this lawsuit for further benefits under the county's OJI policy.  After a trial, the trial court found that the plaintiff did not have a permanent vocational disability and held in favor of the county.  The plaintiff now appeals.  We affirm, concluding that there is no reason to reject the trial court's determinations of credibility and that the evidence does not preponderate against the trial court's decision.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, J., and DAVID R. FARMER, J., joined.

Barclay M. Roberts and Lesley Gunther, Memphis, Tennessee, for the appellant, Debra Owens.

Marcy N. Ingram, Assistant Shelby County Attorney, Memphis, Tennessee, for the appellee, Shelby County Government.

**OPINION**

Plaintiff/Appellant Debra Owens ("Owens"), who was forty (40) years old at the time of trial, is employed by Defendant/Appellant Shelby County Government ("the County") as a deputy jailer

in the Sheriff's office.[1]  On June 24, 2001, Owens suffered an on-the-job injury when she slipped and fell in the course and scope of her employment.  Her injury was deemed compensable under the County's On-the-Job Injury ("OJI") Policy.  At the time of Owens' injury, the County's OJI policy provided benefits in accordance with the Tennessee Workers' Compensation Act ("the Act") to the extent that the Act does not contradict provisions specifically set out in the policy itself.[2]  At the time of Owens' injury, her earnings were sufficient to entitle her to a workers' compensation benefit rate of $366.40 per week.

Two days after the incident, Owens was treated for her injuries by Riley Jones, M.D. ("Dr. Jones").  After Dr. Jones discharged Owens on August 30, 2001, she was denied additional OJI benefits.  Owens missed only two days of work due to the accident.  Since Owens made a meaningful return to work, her permanent partial benefits were capped pursuant to Tennessee Code Annotated § 50-6-241.

On September 6, 2002, Owens filed a lawsuit against the County seeking OJI benefits, alleging that the slip-and-fall accident she suffered resulted in a partial permanent disability.[3]  After the lawsuit was filed, on April 23, 2003, Owens began seeing Rommel Childress, M.D. ("Dr. Childress") about continuing pain in her back and leg.  Dr. Childress treated Owens over a period of several months.  A week prior to trial, Dr. Childress wrote a letter to counsel for Owens opining that Owens had suffered a 6% permanent impairment rating to her body as a whole.

A bench trial was conducted in this matter on July 7, 2005.  Prior to trial, the parties stipulated to certain facts, and the sole issue before the trial court was whether Owens was entitled to permanent partial disability benefits, including reimbursement for the medical treatment she received from Dr. Childress and for expenses related to the removal of a benign tumor from Owens' back.

Owens testified at trial.  She outlined her educational background, testifying that she graduated from high school and received a certificate from a vocational school in accounting.  Prior to her employment by the County, she had been employed at Cleo Wrap as an inspector-packer, at Haverty's Furniture as a customer service representative, and at Flying J as a cashier.  She began working for the County in August 2000.  As a deputy jailer, Owens' job was to ensure the safety, security, and welfare of the inmates, and she patrolled the cells to prevent fighting or other disruption.  Her work required her to be on her feet most of the day.  In 1991, Owens said, she was involved in a car accident that caused an injury to her back, but she maintained that that injury had resolved before the incident at issue.

---

[1] The parties stipulated to the underlying facts of this case.

[2] At the time of the injury, the County's OJI Policy was silent as to the payment of permanent disability benefits. By the terms of the policy, the Act is to be used as a guide where the OJI Policy is silent.

[3] The initial complaint was filed against the County, the Mayor of Shelby County, and the Sheriff of Shelby County.  All defendants other than the County have been dismissed from the lawsuit.

On the day in question, Owens slipped and fell in the hallway at work, injuring her lower back and her left wrist. Her employer sent her to the hospital emergency room. She drove herself to the hospital, received treatment, and stayed overnight. On June 26, 2001, she went to the office of Dr. Jones, to whom she was referred by the County, for treatment. Dr. Jones prescribed pain medication for Owens and sent her to physical therapy. The next day, Dr. Jones sent her back to work on light duty, and Owens ended up missing only one or two days of work because of the injury. At some point later, Owens underwent an MRI scan, which showed that she had a mass on her back. The mass turned out to be a benign lipoma. Dr. Jones was of the opinion that the lipoma was unrelated to the slip-and-fall, and he suggested that Owens see her family physician for treatment of the lipoma. Dr. Jones released Owens from his care on August 30, 2001. In December 2001 or January 2002, another physician, Dr. Loisseau, removed the lipoma from Owens' back.

Since Dr. Jones released Owens from his care, Owens has been working full duty with no restrictions. Owens claimed, however, that after she was discharged from Dr. Jones' care, she continued to suffer pain in her lower back, her left leg, and her left foot. She also testified that she has difficulty either sitting or standing for long periods of time. While Owens anticipated being able to continue working at her current position despite the pain, she asserted that she would not be able to perform the jobs that she previously held at Cleo Wrap or Flying J, because those jobs involved even more standing and lifting than her position with the County.

The depositions of both Dr. Jones and Dr. Childress, along with their medical records on Owens' treatment, were submitted into evidence. In his deposition, Dr. Jones described his treatment of Owens between June 26, 2001, and August 30, 2001. In her first visit, Owens complained to Dr. Jones of pain in her lower abdomen, the left side of her neck, her left arm, her lower back, and her left leg. Dr. Jones noted that Owens got onto the examination table with no difficulty, putting the full weight of her body onto the left wrist as she did so. There was no comparable spasm, and she flexed her leg to eighty (80) degrees. Dr. Jones' report showed that he found no objective problems, and he stated, "I think she has bruised herself." After some testing, he prescribed pain medication and physical therapy three times per week, and he sent her to work on light duty. At the time, Owens was upset about having to return to work, but Dr. Jones explained to her that she would have limitations on her work. Dr. Jones continued to see Owens and noted that she progressed over time. At Owens' July 24, 2001 visit with Dr. Jones, he observed that her straight leg raise and motor sensory tests were normal, and that she could "bend over and almost touch her toes." He ordered an MRI scan and a bone scan for Owens in early August 2001.

At Owens' August 16, 2001 visit, Dr. Jones noted that Owens' bone scan was normal, and that she was neurologically normal. He took note of the mass that was revealed in the MRI, but told Owens that it was not related to her work and that she needed to visit her family doctor for a biopsy. Dr. Jones spoke with Owens' physical therapist, who told him that Owens was "not pushing and is not trying to progress, but she has good enough strength to return to her regular duty" at work. The therapist's examination showed that Owens had full flexion and a little pain with her leg extension, but that she walked without a limp and was "sitting very easily and moving well." Dr. Jones felt at this visit that Owens could return to full duty at work. On the final visit, August 30, 2001, Dr. Jones

observed that the testing indicated that Owens was capable of unrestricted activity. She had full range of motion, but complained of a some pain with her extension. He determined that Owens was ready for regular duty at work and assigned her "no permanent partial impairment." Owens was then discharged from Dr. Jones' care.

Dr. Jones stated that Owens was not likely to be predisposed to reinjury. He reiterated his opinion that Owens had no permanent impairment, based on the MRI results and the fact that she had full range of motion. Dr. Jones acknowledged that, other than reviewing the surgeon's report, he had not reviewed notes on Owens' care from other physicians. He conceded that, when he released her, she was still complaining of pain.

Dr. Childress' deposition testimony and records were also considered at trial. In his deposition, Dr. Childress testified that Owens' primary care doctor had referred her to him. At Owens' first visit to Dr. Childress in April 2003, Owens complained to him of continued back and leg pain arising from the slip-and-fall. Dr. Childress acknowledged that the only information he had about Owens' history was given to him by Owens. Owens reported to Dr. Childress that she was working at her regular job with some difficulty and was using mild pain medicines, such as Ibuprofen. He observed that she was a moderately obese woman in no acute distress, although she had some mild muscle spasm during the testing. He reported that she had normal strength and motor function in her lower extremities, but was very sensitive with straight leg raising. He prescribed pain medication for Owens, ordered her medical records, and scheduled a follow-up visit. At her next visit, on June 9, 2003, Dr. Childress noted that Owens still complained of pain and difficulty with bending and stooping, and had discomfort on her left side, but she did not complain "too much" about neck pain or spasms. She told Dr. Childress that her major problems were her lower back and legs. She reported numbness in that area, mostly on the left side but some on the right. He prescribed pain medicines, ordered some tests, and scheduled follow-up visits.

In June 2003, Dr. Childress noted that Owens' December 2002 MRI scan showed results that were within normal limits, revealing no ruptured or bulging disc in association with pinched nerves. He testified that, prior to Owens' August 2003 visit, he had EMG nerve conduction studies performed. These studies showed some abnormal electrical activity in Owens' back. Dr. Childress testified that this objective evidence was consistent with some nerve irritation in the lower back region. He further noted that Owens' neurological function was intact.

In September 2003, Owens complained to Dr. Childress of upper back spasms and tingling in her left hand. Dr. Childress noted palpable spasms at certain rotations, and he consequently ordered another MRI scan. Despite Dr. Childress' order, the MRI scan was not scheduled. In Owens' November 2003 visit, Dr. Childress encouraged her to adopt a long-term plan to treat her chronic difficulties, including losing weight, attempting light exercise such as stationary bicycling or walking on the treadmill, and doing stretching activities. In her December 2003 visit, Owens complained of difficulty with her back, particularly related to resting at night. In February 2004, Owens reported to Dr. Childress that she was having more pain and spasm than normal, and Dr. Childress prescribed pain medication. In September 2004, Dr. Childress performed another EMG

nerve conduction study on Owens, which suggested some element of radiculopathy, which is progressive nerve root irritation in the lower back. He ordered Owens to undergo an MRI scan in order to rule out any disc pathology. Dr. Childress was of the opinion that the mass in Owens' back that was removed years earlier was an incidental finding that was not related to the work injury.

Owens did not see Dr. Childress again until May 3, 2005. Dr. Childress noted that Owens had not been to see him in several months, but that in this visit she complained of continued pain in her neck and left leg. He recorded palpable spasms at certain degrees of flexion and leg raising, but observed that her reflexes and neurological function were normal. The MRI scan that had been previously ordered was performed in May 2005. Dr. Childress reviewed the MRI results at the June 2005 follow-up visit, noting that the MRI scan was "unremarkable," and that Owens' neurological function was intact. She continued to complain of pain in her back and in her left groin area. To treat these symptoms, Dr. Childress showed Owens some stretches.

Owens' attorney sent Dr. Childress a request for Owens' medical records. In response, on July 1, 2005, Dr. Childress sent a letter to the attorney summarizing his treatment of Owens. In the letter, Dr. Childress noted the normal results of Owens' May 2005 MRI scan and opined that Owens had sustained a partial permanent impairment directly related to the June 24, 2001 injury. He assigned Owens a permanent impairment rating of 6% to the body as a whole, using the AMA guidelines. In his deposition, Dr. Childress confirmed that his letter to Owens' attorney accurately reflected his opinion to a reasonable degree of medical certainty. He stated that Owens had received continuous treatment since her accident, and that she had had continual consistent difficulty that had not ceased completely. When asked whether Owens was capable of performing her usual work duties, Dr. Childress responded that "she was performing them with some difficulties but she was managing." He suspected that, over time, Owens would require some mild paid medication and anti-inflammatory medication, but he did not anticipate that she would require surgery. Dr. Childress verified that his medical charges to date were $1,545. The trial judge took the case under advisement.

On July 12, 2005, the trial court issued its ruling in open court. The trial judge reviewed the evidence and commented that "this case essentially rises and falls largely on the medical proof." In reaching its conclusion, the trial court distinguished between an anatomical impairment and a vocational disability, describing a vocational disability as "an inability to compete for jobs in an open labor market by reason of some anatomical impairment." In contrast, the trial judge said, having an "anatomical impairment does not always equate to vocational disability." On that premise, the trial court engaged in a detailed weighing of the evidence and determined that Owens did not have a vocational disability arising from the June 24, 2001 accident. The trial court found it critical that the tests performed by Dr. Jones showed that Owens was "capable of unrestricted activity" when she was released from his care in August 2001. On the other hand, the trial court noted, although Dr. Childress had treated Owens and repeatedly suggested that she undergo an MRI scan, Owens stopped seeing him in September 2004 and did not visit his office or submit to the MRI scan until shortly before trial. The results of the May 2005 MRI scan, the trial court observed, were "unremarkable." The trial court also commented that "[n]either doctor says that this employee is incapable of doing

work of any kind. And there is no evidence that any jobs in an open labor market are foreclosed to this employee."

Based on this evaluation of the witnesses' testimony, the trial court concluded that Owens had not carried her burden of showing that she had a vocational disability. On July 28, 2005, the trial court entered an order holding in favor of the County and incorporating its oral ruling by reference. From this order, Owens now appeals.

On appeal, Owens argues that the evidence preponderates against the trial court's conclusion that she does not have a vocational impairment. She asserts that the trial court credited the testimony of both physicians and claims that it made no finding regarding Dr. Childress' conclusion that she suffered a 6% anatomical impairment. Owens argues that, because the trial court credited other portions of Dr. Childress' testimony, then it must necessarily have also adopted his opinion that Owens suffered a permanent anatomical impairment of 6% to the body as a whole. Owens argues that this anatomical impairment, along with the other relevant factors, showed that she suffered from a compensable vocational impairment.

In a case such as this, tried without a jury, we review the trial court's findings of fact *de novo* on the record, presuming those findings to be correct, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). The extent of an injured worker's vocational disability is a question of fact, to be reviewed under this standard. *Seals v. England/Corasir Upholstry Mfg. Co.*, 984 S.W.2d 912, 915 (Tenn. 1999). "When a trial court has seen and heard witnesses, especially where issues of credibility and weight of oral testimony are involved, considerable deference must be accorded to the trial court's factual findings." *Id.* However, when, as in this case, the medical proof is submitted by deposition, this court is in the same position as the trial judge to evaluate such proof and may assess independently the weight and credibility to be afforded to such expert testimony. *See Richards v. Liberty Mut. Ins. Co.*, 70 S.W.3d 729, 732 (Tenn. 2002).

With that standard of review in mind, we turn to the issue of whether the evidence preponderates against the trial court's determination that Owens suffered no vocational disability. This element must be established in order to recover permanent partial disability benefits. *See* T.C.A. §§ 50-6-207(3); 50-6-241(a) (2005). Permanency and causation must be established through medical testimony, but the extent of the disability may be established through both lay and expert testimony. *Bailey v. Knox County*, 732 S.W.2d 597, 597-98 (Tenn. 1987) (quoting *Hinson v. Wal-Mart Stores, Inc.*, 654 S.W.2d 675, 677 (Tenn. 1983)). The claimant, Owens, has the burden of proving vocational disability by a preponderance of the evidence. *Tindall v. Waring Park Ass'n*, 725 S.W.2d 935, 937 (Tenn. 1987). Relevant factors in making this determination are the employee's skills and training, education, age, local job opportunities, anatomical impairment rating, and capacity to work at the kinds of employment available in his or her disabled condition. T.C.A. § 50-6-241(b) (2005); *Worthington v. Modine Mfg. Co.*, 798 S.W.2d 232, 234 (Tenn. 1990). The claimant's own assessment of his physical condition and resulting disabilities is also a relevant consideration. *Walker v. Saturn Corp.*, 986 S.W.2d 204, 208 (Tenn. 1998) (citing *Uptain Constr. Co. v. McClain*, 526 S.W.2d 458, 459 (Tenn.1975); *Tom Still Transfer Co. v. Way*, 482 S.W.2d

775, 777 (Tenn. 1972)). The trial court correctly noted that "[a]natomical impairment is a distinct finding from vocational disability and is but one factor to be considered in determining the extent of vocational disability." *George v. Bldg. Materials Corp. of Am.*, 44 S.W.3d 481, 488 (Tenn. 2001).

In this case, the trial court was presented with the testimony of Owens and the deposition testimony of two treating physicians, Dr. Jones and Dr. Childress. The main dispute in this case was whether Owens suffered a permanent injury that resulted in a vocational disability. A vocational disability results when "the employee's ability to earn wages in any form of employment that would have been available to him in an uninjured condition is diminished by an injury." *Corcoran v. Foster Auto GMC, Inc.*, 746 S.W.2d 452, 459 (Tenn. 1988).

Dr. Jones concluded that Owens suffered no anatomical impairment and released her to return to full-duty work in August 2001 with no restrictions. The evidence submitted through Dr. Jones supports the conclusion that Owens did not have a permanent vocational disability. When Dr. Jones first saw Owens two days after the accident, he saw no objective injuries but surmised that Owens had "bruised herself." Over the course of his treatment of her, Dr. Jones administered a battery of tests designed to measure Owens' actual impairment and capabilities. After the August 16, 2001 bone scan was done, Dr. Jones concluded that the results of all of the tests showed that Owens was normal, neurologically and otherwise, and he observed that she was "sitting very easily and moving well." In light of this, he released Owens to full-duty work, finding that she was capable of unrestricted activity, and determining that she had "no permanent partial impairment."

Dr. Childress, on the other hand, viewed Owens' condition in a different light, noting that two years after the slip-and-fall incident, Owens reported to him that she still had pain. In light of this, he assessed Owens' a 6% impairment to her body as a whole; however, he never restricted her activity. Rather, he encouraged her to lose weight and engage in light exercise. Thus, neither physician found that Owens' activity was restricted in any way that impacted her vocational ability. Rather, the only evidence that Owens was restricted in her mobility was her own testimony, in which she asserted that she would not have been able to perform her previous jobs at Cleo Wrap or Flying J, and that she would not be able to perform any other job that required prolonged standing. The trial judge heard Owens' live testimony at the trial and implicitly declined to credit her assertion that her mobility was restricted. This implicit credibility determination is entitled to great deference on appeal. *See Richards*, 70 S.W.3d at 732.

Considering the totality of the evidence and all of the relevant factors, and giving appropriate deference to the trial court's credibility findings, we find that the evidence does not preponderate against the trial court's conclusion that Owens does not have a permanent vocational disability.

The decision of the trial court is affirmed. Costs on appeal are to be taxed to Appellant Debra Owens, and her surety, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE